UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODNEY GREEN,

    Petitioner,         Case Number: 05-CV-72613
                  Honorable George Caram Steeh

v.

BLAINE LAFLER,

    Respondent.
_____/

## <u>OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY</u>

Petitioner Rodney Green, a Michigan state prisoner, has filed an application through his attorney for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Green was convicted by a jury in Michigan's Wayne County Circuit Court on one count of first-degree premeditated murder, nine counts of assault with intent to commit murder, and one count of being a felon in possession of a firearm. Green was sentenced to life imprisonment on the first-degree murder conviction, fifteen to sixty years on all counts of the assault with intent to commit murder convictions, and a consecutive two-year term on the felony-firearm conviction. For the reasons set forth below, the petition will be denied.

I.

Green's convictions arise from a March 7, 2001, 10:30 p.m. shooting at 15330 Patton Street in Detroit, Michigan. The house at that address was riddled with bullets by shots from outside the home. One of ten people inside the home, four-year-old Shania Salter, was killed by a bullet shot from an AK-47 firearm. There were no eyewitnesses who observed the shooter(s).

Darnel Wilkins testified at Green's trial that, approximately two hours before the shooting, he was walking to his home at 15330 Patton from a nearby store when he exchanged words with three men who appeared to be drunk. The men were standing in front of a house two doors down from Wilkins' home. Wilkins became angry, and fired a shot into the air from a .38 caliber revolver he was carrying. The three men reacted by walking up onto a porch and into a home. Wilkins testified he then returned to his own home. Wilkins could not identify the men at trial because it was dark outside when he encountered them on the street.

Tamara Bennett testified that, on March 7, 2001, she arrived at her mother Cassandra Bennett's home on Patton Street at around 7:00 p.m.. Tamara first went to a local store with her cousin Tamika, and when they returned, Tamara was met outside her mother's home by petitioner's co-defendant, Timothy Barnes. Barnes told Tamara that he had had an altercation with a man at the store, and that he was going to return to "beat the man up." Tamara went inside her mother's home while Barnes remained outside with Tamika. Petitioner Green, known as "Hot Rod," was also inside the Bennett home along with Cassandra. Tamara heard a gunshot outside, and when Barnes and Tamika entered the home, Tamara heard Barnes hollering about "shooting up" and burning down Wilkins' home. Bennett testified that Green said nothing as he sat on a couch. Cassandra walked down the street to talk with Wilkins, and when she returned, she refused to let Barnes go outside because, according to Tamara, Wilkins told Cassandra that the gunshot was meant for Barnes. Barnes reacted by saying that "he was not going out like no punk," and that "[h]e was going to go shoot the house up - - burn the house up and shoot it." Barnes called his brother Robert Borns, then left with Green.

Robert Borns testified that he received a call from his brother Barnes at about 5:00 p.m. on

March 7, 2001.  Barnes asked Borns to bring Barnes' 9.0 millimeter handgun over to their mother's home on Patton Street, where Barnes lived, because Barnes had had a problem with someone at a nearby store.  When Borns delayed, Barnes called him again between 5:45 and 6:00 p.m. and threatened to shoot-up Borns' home if he did not bring the weapon.   Borns arrived at his mother's home, and saw Green, Barnes, and Leslie Hurns, also known as "Junior," standing outside the home drinking.  Barnes told Borns that a guy down the street, Wilkins, had just shot at him and Green. The four men went inside the home and into Barnes' basement bedroom where Borns handed Barnes his loaded 9.0 millimeter semi-automatic handgun.  Borns testified that he had taken the weapon away from Barnes two weeks earlier because Barnes was drunk and was "starting stuff" on Borns' block.  Borns testified that he saw Green pick up an "SK" or "AK" firearm from underneath Barnes' mattress, a firearm that also belonged to Barnes.  Borns left to walk down the street to talk with Cassandra Bennett, leaving Green, Barnes and Hurns once again standing outside drinking.  When Borns returned, only Green and Barnes were standing outside.  Borns testified that Green said "let's burn it up and shoot it up."  Barnes and Green continued to talk about shooting up and burning down Wilkins' home, and when Borns suggested they "sleep it off," Barnes and Green responded that they were going to "handle our business tonight."  Barnes and Green were standing outside of the home when Borns left, Barnes armed with the 9.0 millimeter handgun, and Green armed with the AK-47 rifle.  At 9:30 p.m., Borns called Barnes to ask what he was doing, and Barnes stated he was still outside drinking with Green, stating again that the two had to "handle our business tonight."

        Borns learned of the shooting at 15330 Patton the next morning from a call he received from Cassandra Bennett, asking Borns if he had watched the news.  Before Borns could turn on his televison, he received a call from Barnes asking that Borns pick up some money for him from across

the street because he was about ready to leave town.  Borns asked Barnes if he and Green had shot-up Wilkins' house, to which Barnes replied in the affirmative.

Borns denied any involvement in the shooting, and admitted that he had an agreement with the prosecutor that he would not be charged with a crime for providing Barnes with the 9.0 millimeter handgun in exchange for his testimony.  The trial court denied Green's request that a cautionary instruction be given to the jury regarding the unreliability of an accomplice's testimony, finding Borns was not an accomplice to the charged crimes.

Police arriving at the scene found Shania Salter fatally wounded in a first-floor bedroom. The bullet that killed Shania was identified as a 7.63 millimeter projectile fired from an AK-47. Wilkins testified to hearing gunshots fired in two distinct groupings, the first sounding as if fired from a machine gun.  Eric Perryman, another occupant of 15330 Patton at the time of the shooting, testified that he had returned one shot out of a window before his gun jammed.  Evidence technicians found 9.0 millimeter and 7.63 millimeter shell casings outside 15330 Patton.  Consistent with Perryman's testimony, a "30-30" casing was found inside the home along with a corresponding weapon.  During a search of Barnes' home days later, police found a box of 9.0 millimeter ammunition.  The weapons used in the crimes were never recovered.

Following his convictions, Green was sentenced on December 10, 2001.   Green, through counsel, filed a first right of appeal with the Michigan Court of Appeals raising the following claims:

> I.      Did the trial court commit reversible error by failing to give the requested cautionary instruction on the unreliability of accomplice testimony with regard to the prosecution's key witness in violation of Defendant's right to a properly instructed jury?

> II.     Did the prosecutor violate Defendant's state and federal constitutional rights to a fair trial by engaging in prejudicial

conduct?

III.    Did the introduction of Timothy Barnes' statements to Robert Borns violate the hearsay rule and Defendant's rights to confrontation and to a fair trial?

On August 12, 2003, the Michigan Court of Appeals affirmed Green's convictions. *People v. Rodney Green*, No. 239989, 2003 WL 21921177 (Mich. Ct. App. Aug. 12, 2003) (unpublished). Green's application for leave to appeal in the Michigan Supreme Court was denied. *People v. Rodney Green*, 469 Mich. 1029, 679 N.W.2d 66 (2004). Green's petition for habeas relief raises the same issues raised in his direct appeal.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs habeas corpus review of state court decisions. 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under the "contrary to" clause of § 2254(d)(1), a federal court may grant a writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has decided an issue on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant

-5-

habeas relief if the state court identifies the correct governing legal principle from Supreme Court decisions, but unreasonably applies that principle to the facts. *Id.* at 407-08. Relief is also available if the state court decision unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable." *Williams*, *supra* at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

A.

Green first claims that he is entitled to habeas relief because the trial court failed to properly instruct the jury regarding the unreliability of Borns' testimony as an accomplice. The Michigan Court of Appeals relied in part upon Green's failure to object to the jury instructions at trial in rejecting this claim:

> On appeal, defendant first argues that the trial court erred in refusing his request to give the cautionary jury instructions on accomplice testimony. CJI2d 5.5, 5.6. We disagree. Even if we concede that Borns was arguably an accomplice because he supplied the nine-millimeter pistol to his brother, there is no error requiring reversal in the failure to give the instructions as requested.

> To preserve an instructional issue for appeal, a party must request the instruction before instructions are given *and* must object on the record before the jury retires to deliberate. MCR 2.516(C), *Hunt v Deming*, 375 Mich 581, 584-585; 134 NW2d 662 (1965); *Leavitt v Monaco Coach Corp*, 241 Mich App 288, 300; 616 NW2d 175 (2000). The objection must specifically state the objectionable matter and ground for the objection. MCR 516(C), *Hammack v Lutheran Social Services*, 211 Mich App 1, 10; 535 NW2d 215 (1995). Where a party expressly adopts the trial court's instructions, an appeal is waived. *Chastain v General Motors Corp*, 254 Mich App 576, 591; 657 NW2d 804 (2002).

> In this case, defendant requested the accomplice instructions

-6-

before the court instructed the jury. The court considered the argument that Borns was an accomplice and rejected it. After instructing the jury, the trial court asked counsel, "Anything? Was anything omitted? There was nothing else instructed or requested. Anything omitted?" Defense counsel answered, "No". (sic) After a brief discussion about some other instructions, the court again addressed counsel, "anything else from anybody?" Defense counsel made no response. The issue is waived.

Under MCL 769.26 a conviction may not be set aside because of erroneous jury instructions unless the error resulted in a miscarriage of justice. Our review of the record convinces us that there was no error in refusing to give the accomplice instructions because the testimony did not support the conclusion that Borns was an accomplice to the crime. Borns testified that when Barnes first called demanding that Borns deliver the nine millimeter gun, Barnes told Borns that it was because there had been an argument with the owner of a neighborhood store. It was only after Borns delivered the gun that he learned about the plan to "shoot up" the house where the little girl was later killed. Borns also testified that he tried to convince defendant and Barnes to abandon their plan and that he left before they did anything in furtherance of their plan. Borns was not an accomplice to the crimes and no miscarriage of justice occurred in the refusal to instruct on that request. *People v. Allen*, 201 Mich App 98, 105; 505 NW2d 869 (1993).

*People v. Rodney Green*, *supra*, slip op. at 2 (Footnotes omitted).

Federal habeas relief may be precluded on a claim if the petitioner failed to present the claim in state court in accordance with the state's procedural rules, and the last state court rendering a judgment in the case rests its judgment on the procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 85 (1977). The failure to raise a contemporaneous objection is a firmly-established independent and adequate state-law ground for refusing to review asserted trial errors. *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice, or a showing of a fundamental miscarriage of justice. *Id.* at 753. To establish cause for

-7-

noncompliance, a petitioner must show that "some objective factor external to the defense impeded . . . his efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

In denying appellate relief, the Michigan Court of Appeals, the last state court rendering a judgment in the case, sufficiently relied upon Green's procedural default of failing to timely object to the jury instructions despite also reviewing the claim for plain error. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). Although defense counsel's failure to properly preserve a claim for review in state court may establish cause, *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000), the claim of ineffective counsel must also be exhausted and not procedurally defaulted. *Murray*, *supra* at 488-489. Green did not claim ineffective assistance of trial counsel in state court, and has not otherwise advanced a claim of an objective external impediment to preserving his claim of instructional error for appeal. Green does not claim ineffective assistance of trial counsel here. Green has not shown cause for the procedural default.

Green is also unable to show actual prejudice resulting from the jury instructions. To warrant habeas relief, jury instructions, when taken as a whole, must be so infirm as to render the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000). General instructions that direct the jury to examine a witness's motivation and credibility are sufficient despite a request for more specific instructions. *Scott, 209 F.3d* at 883. In *United States v. Carr*, 5 F.3d 986 (6th Cir. 1993), a panel of the Sixth Circuit found no error in refusing defense counsel's request for an accomplice instruction:

> The court's instruction adequately informed the jury regarding the credibility of witness testimony, and so we are not troubled simply because the court chose not to explicitly highlight the credibility problems inherent in accomplice testimony. The instructions alerted

-8-

the jury to the various considerations that it should take into account in weighing testimony, and it had an amply basis for rejecting the testimony of the accomplice witness if it had chosen to do so. In short, because the instructions given by the court substantially covered the same material as the instruction requested by the defendant, there was no reversible error.

*Id.* at 992.

Although Green's request for an accomplice testimony instruction was denied by the trial court, a cautionary instruction was given to the jury consistent with Borns' testimony that he had an immunity agreement with the prosecutor. Moreover, the state court's determination that Borns was not an accomplice to the crimes was reasonable in light of the evidence presented at trial. State law instructional errors rarely form the basis for federal habeas relief. *Estelle*, 502 U.S. at 71-72. Green has not established that the jury instructions, as a whole, were so infirm as to render his trial fundamentally unfair. The omission of an accomplice jury instruction did not result in a fundamental miscarriage of justice. *Bousley v. United States*, 523 U.S. 614, 624 (1998). Green's first claim is without merit due to procedural default. *Coleman*, 501 U.S. at 750-51, 53; *Wainwright*, 433 U.S. at 85.

B.

Green next claims that he is entitled to habeas relief due to three alleged instances of prosecutorial misconduct involving: (1) the improper use of a victim photograph at trial; (2) closing arguments referring to Green's failure to testify; and (3) appeals to juror sympathies. The Michigan Court of Appeals rejected these claims of prosecutorial misconduct, reasoning:

Defendant next argues that the prosecutor committed misconduct in commenting on defendant's failure to testify and in evoking sympathy for the young victim. We disagree. Claims of prosecutorial misconduct are reviewed case by case. *People v Kelly*, 231 Mich App 627, 637; 588 NW2d 480 (1998). Our review is de

-9-

novo to determine if defendant was denied a fair and impartial trial. *People v Pfaffle*, 246 Mich App 282, 288; 632 NW2d 162 (2001). After reviewing the record, we conclude that defendant was not denied a fair and impartial trial.

Defendant argues that the prosecutor improperly commented on defendant's failure to testify during closing argument and rebuttal. In both instances, defense counsel objected and the trial court responded appropriately, sustaining the objections. The court also instructed the jury that counsel's arguments are not evidence.

Defendant also claims that prosecutorial misconduct occurred when a photograph of the victim was left on a monitor for the jury to view. Again, defense counsel's objection was sustained, the court found that there was no intent to leave the photo on the monitor and the incident was relatively brief. We find no error and no prejudice.

Defendant also objected during the prosecutor's closing, arguing that there was an improper attempt to evoke sympathy. After a bench conference, the prosecutor clarified the argument briefly and moved on. We find no error. The prosecutor was commenting on the effect of the shooting on the other children who were in the house, but not injured. There was no error.

*People v. Rodney Green*, *supra*, slip op. at 2.

In determining whether federal habeas relief is warranted for prosecutorial misconduct, a federal district court must apply a harmless error standard, deciding whether the prosecutor's conduct and comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Macias v. Makowski*, 291 F.3d 447, 451 (6th Cir. 2002) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Prosecutorial misconduct must be so egregious as to deny a petitioner a fundamentally fair trial. *Donnelly*, 416 U.S. at 643-45.

-10-

The Sixth Circuit applies a two-step approach in determining whether prosecutorial misconduct violated a criminal defendant's due process rights: (1) whether the prosecutor's conduct and remarks were improper, and if so; (2) whether the impropriety was flagrant. *Macias*, 291 F.3d at 452 (citing *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). Whether prosecutorial misconduct was flagrant is decided by weighing four factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks [or conduct] were deliberately or accidently made; and (4) whether the evidence against the defendant was strong." *Macias*, 291 F.3d at 452 (quoting *Carter*, 236 F.3d at 783). Whether the trial court gave cautionary instructions also factors into the calculus of determining whether fundamental fairness was denied. *Serra*, 4 F.3d at 1356. *See also United States v. Payne*, 2 F.3d 706, 715-16 (6th Cir. 1993) (inflammatory remarks in opening and closing statements and throughout trial were not cured by cautionary instructions); *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (closing argument that appeals to the community conscience was cured by cautionary instruction).

### i. Victim Photo

During trial, the prosecutor placed a photograph of the four-year-old shooting victim Shania Salter on a viewing monitor for identification by her grandmother Andrea Terry. Terry had identified Shania at the hospital after the shooting. After the questioning of Terry, the jury was excused for lunch. Green's counsel objected to the monitor being left on during the remainder of the trial, and the trial court sustained the objection. When court resumed, however, the photograph remained on the monitor during the initial questioning of Shania's mother. At defense counsel's request, the trial court conducted a side-bar, and the prosecutor explained that someone else had set

-11-

up the equipment after the lunch break, and the picture was then removed.

Green did not object to the admission of Shania's photograph during the questioning of Terry. Indeed, the Sixth Circuit has held that even the admission of gruesome photographs of a homicide victim "does not present a question of constitutional magnitude." *Pearl v. Cason*, 219 F.Supp.2d 820, 830 (E.D. Mich. 2002) (citing *Cooley v. Coyle*, 289 F.3d 882, 893-94 (6th Cir. 2002) (citing *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997))). To the extent the prosecutor erred by failing to remove the photograph during the juror's lunch break, the continuing display of the photo after lunch did not mislead the jury or prejudice Green considering the photo had very recently been properly viewed by the jury, the continuing display was isolated and accidental, and the trial court later instructed the jury that: "You must not let sympathy or prejudice influence your decision." (Trial Tr., dated Nov. 19, 2001, pp.176.) The brief and inadvertent continuing display of Shania's photograph was harmless error that did not "so perniciously affect the prosecution of [the] criminal case as to deny the defendant the fundamental right to a fair trial." *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (quoting *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002)).

### ii. Comments on Failure to Testify

During closing argument, the prosecutor referred to Borns' trial testimony involving incriminating statements made by Green:

> And ladies and gentlemen, I [sic] other thing that you are witnesses to everything that happen in this room. I also ask that you witness when Robert Borns was testifying who told you that he was at this mother's house, [Green] was there, and [Green] said all these things, let's shoot it up. Went and got the AK. And did you notice the body language of [Green]. Did he sit up there and say I have a right to confront my witnesses as he does in his constitutional rights --

(Trial Tr., dated Nov. 19, 2001, p. 124.) Defense counsel immediately objected, and the trial court

-12-

conducted a side-bar, after which the trial court instructed the jury that "like I told you at the beginning of trial, what the attorneys say in their closing argument is not evidence."  (Id., p. 125).

Defense counsel responded in closing argument by telling jurors: "My client said I didn't do that.  That's why we're here.  That's why this trial is, my client said I didn't do it."  (Trial Tr., dated Nov. 19, 2001, p. 138.)  The prosecutor later rebutted: "Counsel said to you specifically and I wrote it down.  The defendant says he didn't do it.  You've heard no testimony to that --"  (Trial Tr., dated Nov. 19, 2001, p. 164.)  Defense counsel again immediately objected, the trial court conducted another side-bar, and then instructed the jurors: "I'm going to be instructing you on the law that applies to the case in a few minutes.  What the attorneys say in closing argument as I told you before is not evidence."  (Id., p. 164-166).  The trial judge later instructed the jury that: "Every defendant has the absolute right not to testify.  When you decide the case, you must not consider the fact that he did not testify."  (Id., p. 192).

A prosecutor is constitutionally prohibited from commenting on a defendant's refusal to testify because it penalizes a defendant for exercising his or her Fifth Amendment right.  *Griffin v. California*, 380 U.S. 609, 614 (1965).  If, as here, the comments are of an indirect nature, the court must determine "whether the comments were 'manifestly intended' by the prosecutor as a comment on the defendant's failure to testify or were of such a character that the jury would naturally and reasonably take them to be comments on the failure of the accused to testify."  *Bagby v. Sowders*, 894 F.2d 792, 797-798 (6th Cir. 1990).  "Manifest intent" to comment on the defendant's failure to testify will not be found if other explanations for the prosecutor's comments are equally possible. *Byrd v. Collins*, 209 F.3d 486, 534 (6th Cir. 2000) (citing *United States v. Ursery*, 109 F.3d 1129, 1135 (6th Cir. 1997)).  "[T]he question is not whether the jury possibly or even probably would view

-13-

the statements as comments on the defendant's failure to testify, 'but whether the jury necessarily

would have done so.'" Id. at 534 (quoting *Ursery*, 109 F.3d at 1135).  Applying a probing analysis,

a federal district court should also consider: (1) whether the remarks were isolated or extensive; (2)

whether the evidence of guilt was otherwise overwhelming; and (3) whether and when curative

instructions were given.  *Byrd*, 209 F.3d at 533-34.

The prosecutor's comments during closing argument were not manifestly intended as a

comment on Green's failure to testify at trial, nor would the jury have necessarily understood the

comments as such.  The prosecutor, defense counsel, and the trial court each understood that the

prosecutor's first comment was directed at Green's physical demeanor as he sat listening to Borns'

testimony, as explained by the trial judge:

> Finally, there was some remarks about [Green's] demeanor during the trial that
> [the prosecutor] wanted to argue to the jury which I think is clearly inappropriate.
> And I know there was some statement that [Green] acts out in some manner, or does
> something, that might be, which I agree.  That didn't happen so I sustained those
> objections.

(Trial Tr., dated Nov. 19, 2001, p. 171.)  It is equally possible that the jury likewise understood the

prosecutor's "confrontation" comment to reflect on comment on Green's physical demeanor.

The second comment by the prosecutor was clearly in rebuttal to defense counsel's argument

that Green said: "I didn't do it."  If the prosecution's reference to the defendant's opportunity to

testify is a fair response to a claim made by the defendant or his counsel during closing argument,

there is no violation of the Fifth Amendment privilege to remain silent at trial.  *United States v.

Robinson*, 485 U.S. 25, 32 (1988).  The jury could have understood that the prosecutor's comments

– "The defendant says he didn't do it.  You've heard no testimony to that --" – was a response to

defense counsel's argument that Green had at some point exclaimed his innocence.

-14-

The prosecutor's comments were isolated, and curative instructions were timely given that an attorney's arguments are not evidence, and that Green had an absolute right not to testify that could not be considered by the jury in reaching its verdict.  Given the evidence before the jury supporting Green's convictions, there was no constitutional error, and the prosecutor's comments did not deny Green a fundamentally fair trial.

### iii Sympathy

During closing argument, Green's defense counsel objected to the following argument made by the prosecutor:

> [Green] not only took the life of a child whose not only taken away, but think about the children in that house who were subjected to what happened.  How does a nine-year old put perspective on the fact that we're watching TV and all of a sudden my sister is laying there dead, and we had to run upstairs screaming.  How does three-year old Laronate remember that she had a sister?
>
> Picture the oldest nine-year old RoShawnte ten years from now getting called down to Frank Murphy to do jury duty.  And she sits in one of the chairs as you do here.  And let's say that she's called to jury duty and a homicide case comes up.  Can you see RowShante raising her hand and saying, my four-year old sister got killed and --

(Trial Tr., dated Nov. 19, 2001, pp.106-107.)  The trial court conducted a side bar and sustained the objection (Id., p. 169), after which the prosecutor continued:

> Think about the impact this had upon the children because they too are complainants in this case.  All nine of the people that were in this house were assaulted by what occurred here.

(Id., p. 107-108).  The trial court later instructed the jury that: "You must not let sympathy or prejudice influence your decision."  (Id., p. 176).

There is no *per se* bar to the introduction of victim impact statements or argument.  *Byrd*, 209 F.3d at 532 (citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)).  In summation, a prosecutor is

-15-

permitted a certain degree of latitude. *Byrd*, 209 F.3d at 532 (quoting United States v. Barker, 553 F.2d 1013, 1025 (6th Cir. 1977)). Relatively isolated comments regarding victim impact that make up only a small part of a prosecutor's closing argument do not merit habeas relief, particularly when combined with appropriate jury instructions. *Byrd*, 209 F.3d at 532-33. Recounting factual allegations is not an appeal to sympathy. *Millender v. Adams,* 376 F.3d 520, 526 (6th Cir. 2004).

The prosecutor's comments regarding the impact of Shania's murder upon two of her sisters were isolated in comparison to the length of the prosecutor's argument. As the prosecutor noted, Shania's sisters were also themselves victims of the charged crimes of assault with intent to commit murder. The jury was given an appropriate instruction. There was no impropriety in the prosecutor's brief victim impact comments which would have denied Green a fundamentally fair trial.

"[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997). Considered as a whole, Green's three claims of prosecutorial misconduct are without merit. Green's convictions did not result from a fundamental denial of due process. *Macias*, 291 F.3d at 451. The state court's decision denying Green appellate relief based on a claim of prosecutorial misconduct was not contrary to, or an unreasonable application of, clearly established federal law.

C.

Green's final claim is that his rights under the Confrontation Clause were violated by the admission of hearsay statements made by co-defendant Barnes to Borns, as attested to by Borns at trial. The Michigan Court of Appeals rejected the claim:

-16-

[Green's] final argument related to testimony of Robert Borns concerning conversations he had with Timothy Barnes before the shooting and on the day after the shooting. Over defense objection, Borns was permitted to testify that when he delivered the nine millimeter pistol, Barnes threatened to "shoot up" and "burn" the house down the street, that [Green] was with Barnes and that both were armed, angry and drunk. The next day, when he asked Barnes if he (Barnes) shot up the house, Barnes admitted that he and [Green] did the shooting. [Green] argues that the testimony was inadmissible hearsay as to him. We disagree.

The admissibility of evidence is reviewed for an abuse of discretion. *People v Bahoda*, 448 Mich 261, 289; 531 NW2d 659 (1995). The statements made before the shooting were within an exception to the hearsay rule and admissible under MRE 803(3) as evidence of existing state of mind and emotional condition. *People v Brownridge (On Remand)*, 237 Mich App 210, 216-217; 602 NW2d 584 (1999). There was no abuse of discretion in allowing Borns to testify to statements made by Barnes in [Green's] presence before the shooting.

The statement Barnes made to Borns the day after the shooting implicating himself and [Green] was also properly admitted. The statement was clearly against Barnes' penal interest under MRE 804(b)(3) and met the test of *People v Barrera*, 451 Mich 261, 268; 547 NW2d 280 (1996). As such, it fell within an exception to the hearsay rule as to Barnes. However, the question is whether the statement was properly admitted against [*Green*]. Where a statement is admissible under MRE 804(b)(3) it may be admissible against a co-defendant if its admission does not violate the defendant's right to confrontation. *People v Poole*, 444 Mich 151, 159-166; 506 NW2d 505 (1993). Here the statement bears sufficient indicia of reliability under the totality of the circumstances to be properly admitted against defendant. The statement was made with [in] a few hours of the shooting to a relative, Barnes' brother, Borns. It was made during a telephone call so there is no suggestion of coercion or anything like an in-custody police interrogation. The admission of guilt did not shift all the blame to [Green] and nothing in the record suggests that Barnes had any reason to lie or distort the truth either as to his own guilt or that of [Green]. We find no abuse of discretion in the admission of the statement. See *People v Beasley*, 239 Mich App 548; 609 NW2d 581 (2000); *People v Schutte*, 240 Mich App 713; 613 NW2d 370 (2000).

-17-

*People v. Rodney Green*, *supra*, slip op. at 3-4.

The Sixth Amendment's Confrontation Clause provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This guarantee applies to both federal and state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, that is, to exclude unreliable out-of-court statements offered as substantive evidence against a criminal defendant.

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66. Later, in *Lilly v. Virginia*, 527 U.S. 116 (1999), a plurality of the Supreme Court held "that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Id*. at 134. The *Roberts* rule, allowing for the admission of such evidence on a showing of particularized guarantees of trustworthiness, remained intact, however, with lower courts directed to independently review whether the circumstances under which the co-defendant's out-of-court statements were made rebutted a presumption of unreliability. *Lilly*, 527 U.S. at 137. The reliability analysis focuses on the conditions under which the particular statements were made, and not on factors such as the existence of corroborating evidence at trial or whether the statement was an admission against the declarant's penal interest. *Id. at* 137-139.

-18-

More recently, in *Crawford v. Washington*, 541 U.S. 36, 61 (2004), the Supreme Court held that "testimonial" inculpatory out-of-court statements made by a co-defendant against the accused are constitutionally barred from admission unless the accused had a prior opportunity to cross-examine the declarant.  "Testimonial" statements include formal statements made by an accuser to a governmental officer during the course of an official investigation as opposed to "non-testimonial" statements made informally to an acquaintance.  *United States v. Gibson*, 409 F.3d 325, 338 (6th Cir. 2005) (citing *Crawford*, 541 U.S. at 51).  If the out-of court statements are "non-testimonial" and bear particularized guarantees of trustworthiness, the statements are admissible under the *Roberts* rule consistent with a criminal defendant's rights under the Confrontation Clause.  *Gibson*, 409 F.3d at 338; *United States v. Franklin*, 415 F.3d 537, 546-47 (6th Cir. 2005); *Jackson v. Renico*, 179 Fed. Appx. 249, 254-55 (6th Cir. April 27, 2006).

Out-of court statements by Barnes to Borns were "non-testimonial" statements.  The statements were informally made by Barnes to his brother Borns, not to a government officer in response to a formal investigation.  *See Gibson*, 409 F.3d at 336, 338 (finding declarant's out-of-court inculpatory statements made to testifying co-worker implicating co-defendants were non-testimonial statements because the statements were not made to the police or during the course of an official investigation); *Franklin*, 415 F.3d at 548 (finding declarant's out-of-court self-inculpatory statements were non-testimonial statements because they were confidentially made to a long-time friend and not to a police investigator); *Jackson*, 179 Fed. Appx. at 255 (same).  *Compare Fulcher v. Motley,* 444 F.3d 791, 795-96 (6th Cir. 2006) (finding declarant's taped out-of-court statements made to police investigators were testimonial statements barred from admission under *Crawford*); *Calvert v. Wilson,* 288 F.3d 823, 830-832 (6th Cir. 2002) (finding declarant's out-of-court statements

-19-

made during in-custody interrogation by police investigators were statements barred from admission under *Lilly* and *Lee v. Illinois*, 476 U.S. 530, 545 (1986)).  Pursuant to *Roberts* and its progeny, Barnes' out-of court statements to Borns, both before and after the shooting, were admissible against Green due to the  particularized guarantees of their trustworthiness, that is, that the statements were made by Barnes  to his brother Borns, whom Barnes trusted with his request for a 9.0 millimeter handgun and threats to shoot up and burn down Wilkin's home, his plan to "handle our business tonight," and his intent to leave town less than 12 hours after the shooting.  *See Gibson*, 409 F.3d at 338 (finding particularized guarantees of trustworthiness where out-of court statements to co-worker did not attempt to curry favor or shift blame to co-defendant); *Franklin*, 415 F.3d at 548 (finding particularized guarantees of trustworthiness where out-of court statements to long-time friend were not made to curry favor with law enforcement, the statements were made while the declarant was "stressed out" and paranoid as opposed to while "puffing" or "bragging," the declarant had no reason to believe his statements would be revealed to law enforcement, and the declarant did not minimize his role in the crime); *Jackson*, 179 Fed. Appx. at 255 (finding particularized guarantees of trustworthiness where out-of court statements to friend were voluntary).  The state court's admission of Borns' testimony relative to Barnes' inculpatory out-of-court statements implicating himself and Green was not contrary to, or an unreasonable application of, clearly established federal law.

### III.

The state court's decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  Green has not established that he is presently in custody in violation of the Constitution or laws of the United States.  Before

-20-

Green can appeal this court's decision, a certificate of appealability must issue. 28 U.S.C. §2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). Green has made no such showing. Accordingly, a CERTIFICATE OF APPEALABILITY is hereby DENIED.

It is **ORDERED** that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE**.

Dated: April 5, 2007

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 5, 2007, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

-21-